CR 22-131 ECT/DTS

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | **INDICTMENT** |
| Plaintiff, ) | |
| ) | 18 U.S.C. § 1343 |
| v. ) | 18 U.S.C. § 981(a)(1)(C) |
| ) | 28 U.S.C. § 2461(c) |
| TEQUISHA SOLOMON, ) | |
| ) | |
| Defendant. ) | |

The UNITED STATES GRAND JURY charges:

### General Allegations

At times material to this Indictment:

### *The Defendant*

1. Defendant TEQUISHA SOLOMON was a resident of Woodbury and South Saint Paul, in the State and District of Minnesota, as well as a resident of Las Vegas and North Las Vegas in the State of Nevada.

2. From at least in or about June 2020 through in or about January 2022, defendant SOLOMON capitalized on the COVID-19 pandemic to exploit emergency funding for needy, eligible unemployed workers and small businesses by engaging in a fraud scheme to obtain and spend benefits and loan proceeds that defendant SOLOMON knew that she, and others, were not entitled to receive. Defendant SOLOMON used false and fraudulent pretenses, representations, promises, and concealment of material facts to apply for pandemic-related unemployment benefits and small business loans for herself and others, which resulted in the payment of at least approximately $4.2 million in fraud proceeds.

SCANNED
JUN 3 0 2022
U.S. DISTRICT COURT ST. PAUL

### *Pandemic-Related Unemployment Benefits*

3. The Social Security Act of 1935 initiated the federal and state unemployment ("UI") system, which provided benefits to individuals who were unemployed for reasons beyond their control. The UI system's purpose was to lessen the effects of unemployment through cash payments made directly to laid-off workers, and to ensure that life necessities were met on a weekly basis while the workers seek employment. The UI system was administered through the states' respective workforce agencies, such as California's Employment Development Department ("EDD"), Minnesota's Department of Employment and Economic Development ("DEED"), and similar agencies in other states.

4. Beginning in or about March 2020 and continuing through in or about September 2021, the federal government provided significant supplemental UI benefits that flowed to and through the states to offset the historic need for unemployment benefits by the American workforce due to the COVID-19 pandemic. Through such legislation as the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") enacted in March 2020, the Consolidated Appropriations Act 2021, and the American Rescue Plan enacted in March 2021, the federal government extended and expanded these UI programs in a number of ways, including by: lengthening the eligibility period for UI benefits; increasing the amount of UI benefits individuals could receive; and extending UI to workers impacted by the COVID-19 pandemic who were not ordinarily eligible for unemployment benefits.

2

5. UI funds through these pandemic-related programs were received by state workforce agencies, such as California's EDD and Minnesota's DEED, from the United States Department of Treasury through a program known as the Automated Standard Application for Payments, which was an electronic system that federal agencies used to transfer funds to recipient organizations.

6. UI claimants were required to answer certain questions to establish their eligibility for UI benefits and to certify that they met one of the COVID-19 related reasons for being unemployed, partially unemployed, or unable or unavailable to work. Although various states' UI applications had their own format and content, they nonetheless generally required that the applicants certify certain information, such as, that the applicants provided true and accurate information, that the applicants were eligible to receive UI from a certain state, and that the applicants had not previously applied for UI from a different state. The state workforce agencies relied upon the information provided by UI claimants in determining eligibility for UI benefits.

7. One way in which some states provided UI benefits to claimants, such as California's EDD, was through the use of Bank of America-issued debit cards that were mailed through the U.S. Postal Service to claimants at the addresses provided in the UI claims. After claimants received their Bank of America debit cards, they could activate it online or over the phone and could use the card to withdraw cash and pay expenses. Alternatively, claimants could provide the state agency with a

bank routing number and bank account, and unemployment benefits were directly deposited to that account.

8. If a state workforce agency approved a UI claim, claimants were required to certify every two weeks via telephone or Internet, under penalty of perjury, that they remained unemployed and eligible to receive UI benefits. Upon receipt of that periodic certification, then the state workforce agency authorized and deposited payment to the claimants' debit cards, which, for California's EDD, meant Bank of America debit cards, or to their bank account.

### *Pandemic-Related Loans to Small Businesses*

9. The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans had government-backed guarantees.

10. An additional source of funding authorized by the CARES Act, and subsequently, by the American Rescue Plan Act of 2021, was the authorization of forgivable loans to small businesses for job retention and certain other expenses, which included a program referred to as the Paycheck Protection Program ("PPP"). To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The

PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) was required to certify, among other things, average monthly payroll expenses, which was used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation, such as a tax return, showing their payroll expenses.

11. A PPP loan application was processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were guaranteed by the SBA. PPP loan proceeds were required to be used on certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities.

12. In addition, the SBA provided direct loans to applicants through the Economic Injury Disaster Loan (EIDL) program, which was also funded by such legislation as the CARES Act to help small businesses facing financial difficulties during the COVID-19 pandemic. EIDL funds were offered in low-interest rate loans, designated for specific business expenses, such as fixed debts, payroll, and business obligations. Eligible EIDL applicants must have suffered "substantial economic injury" from COVID-19 based on a company's actual economic injury determined by the SBA.

13. To qualify for an EIDL loan, applicants were required to submit applications to the SBA, generally through the SBA's website, wherein the applicant provided information including the business's: name, EIN (or social security number for sole proprietorships), gross revenues and cost of goods for the prior year, address, email, date of establishment, number of employees, and bank account information. Applicants were required to certify under penalty of perjury that the information provided in the EIDL application was true and correct.

## THE SCHEME TO DEFRAUD PANDEMIC-RELATED ASSISTANCE PROGRAMS

14. From at least June 2020 through at least in or around January 2022, in the District of Minnesota, and elsewhere, the defendant,

**TEQUISHA SOLOMON,**

did knowingly and intentionally devise and execute a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts.

15. The purpose of the scheme and artifice to defraud was to obtain money and property from states, such as California's EDD and Minnesota's DEED, among others, as well as from the United States, in the form of UI benefits and small business loans by submitting fraudulent claims and applications.

16. As part of her scheme to defraud, defendant SOLOMON filed fraudulent claims seeking UI benefits from states where she had no lawful basis to receive UI benefits because, in fact, she neither resided nor worked in those states. For example, while defendant SOLOMON resided in Minnesota and Nevada, she caused the

6

fraudulent submission of claims to California's EDD, in which she falsely claimed, among other things, that she resided at an address in Los Angeles, California, and that she previously earned income as a "hairstylist" in California, all of which defendant SOLOMON knew was false. As a result of defendant SOLOMON's false and fraudulent claims, California's EDD paid defendant SOLOMON at least $37,000 in periodic UI payments between approximately July 2020 and April 2021, during which time SOLOMON actually resided in either Minnesota or Nevada.

17. It was further part of defendant SOLOMON's scheme that she unlawfully "double-dipped" by obtaining fraudulent UI benefits from multiple states simultaneously. For instance, in or about October 2020, defendant SOLOMON caused the submission of a fraudulent claim for UI to the Illinois Department of Employment Security at which time she was actually residing in Minnesota and was already fraudulently receiving UI benefits from California's EDD, all of which defendant SOLOMON concealed. In her fraudulent claims to Illinois, defendant SOLOMON falsely claimed she was entitled to UI because she had purportedly been self-employed while living at a residence in Chicago. As a result of defendant SOLOMON's false and fraudulent claims, the Illinois Department of Employment Security paid defendant SOLOMON approximately $25,000 in periodic UI payments between approximately November 2020 and February 2021. In addition, in or about March 2021, defendant SOLOMON fraudulently applied for UI from Minnesota's DEED, and concealed her fraudulent receipt of UI benefits from California and Illinois. As a result of defendant SOLOMON's false and fraudulent claims,

Minnesota's DEED paid defendant SOLOMON approximately $18,000 in periodic UI payments between approximately March 2021 and September 2021.

18. It was further part of defendant SOLOMON's scheme that she also fraudulently applied for EIDL and PPP small business loans that were based, among other falsehoods, upon fake payroll information and bogus tax records to deceive lenders. For instance, defendant SOLOMON applied for a $70,000 EIDL in or about June 2020, in which she falsely claimed, among other things, that she owned a supposed cleaning service that had gross revenues of approximately $67,000 in Nevada. In addition, defendant SOLOMON submitted fraudulent PPP loans in March 2021 and April 2021, both of which were based upon fraudulent misrepresentations. More specifically, defendant SOLOMON falsely claimed in her 2021 PPP loan applications that she was the sole proprietor of a business established in January 2019 with average monthly payroll of $8,333. Defendant SOLOMON supported her fraudulent PPP applications with bogus tax records, namely, IRS Schedule C tax forms for tax year 2020, in which she falsely purported to be a "Business Consultant" with gross receipts or sales of approximately $108,550. As a result of defendant SOLOMON's false and fraudulent claims for small business loans, the PPP paid her approximately $41,666 in loan proceeds throughout March and April 2021.

19. In addition to fraudulently obtaining pandemic-related benefits for herself, it was further part of defendant SOLOMON's scheme that she fraudulently obtained pandemic-related funds for others in exchange for a fee in an amount that

8

varied but that was at times approximately $2,000. More specifically, defendant SOLOMON submitted on behalf of others at least 200 false and fraudulent applications for UI benefits.

20.  The various fraudulent UI applications that defendant SOLOMON submitted in the names of other claimants contained false and fraudulent representations, including that the claimants had worked for particular employers, had specific annual incomes, worked during particular time periods, worked in particular states, were self-employed in various occupations, or were laid off and had no work due to the COVID-19 pandemic but were otherwise available to work. Defendant SOLOMON knew that these claims were false. Defendant SOLOMON also knew that these applications regarding the claimants' employment and availability to work were false at the time they were made. For example, in at least one instance, defendant SOLOMON caused the submission of a fraudulent UI claim to California's EDD in or about July 2020 in the name of Individual A, whom defendant SOLOMON knew was not entitled to received UI from any state because, among other things, Individual A was an inmate incarcerated at a Minnesota prison at the time.

21.  As a direct result of defendant SOLOMON's material falsehoods and omissions, defendant SOLOMON caused the United States and multiple state agencies to pay out at least $4.1 million in fraudulent UI benefits and small business loan proceeds to herself and others.

22. Thereafter, as part of her scheme to defraud, defendant SOLOMON received proceeds, either in the form of the fee that she charged others for submitting fraudulent claims on their behalf or in the form of UI benefits and loan proceeds that defendant SOLOMON fraudulently obtained for herself. Defendant SOLOMON maintained these fraudulent proceeds in either cash or in bank accounts that she controlled. Defendant SOLOMON used these fraudulent funds to benefit herself and others, which included such purchases as follows:

(a) on or August 20, 2020, defendant SOLOMON purchased a 2017 Land Rover Range Rover Evoque vehicle for approximately $43,778.50 (the "2017 Evoque");

(b) on or about April 27, 2021, defendant SOLOMON purchased a 2018 Land Rover Velar ("2018 Velar") for approximately $65,371.30 funded, in part, by her trade-in of the 2017 Evoque; and

(c) on or about January 22, 2022, defendant SOLOMON purchased a 2016 Jaguar Sedan, bearing VIN: SAJBD4BV5GCY21649 and temporary Nevada license plate number NX-672-282 for approximately $26,391.55 funded by her trade-in of the 2018 Velar, a transaction which also resulted in defendant SOLOMON receiving a payment back from the car dealer of $25,000.

## COUNTS 1-6
(Wire Fraud)

23. Paragraphs 1 through 22 are incorporated by reference as if fully set forth herein.

24. On or about the dates set forth below, in the State and District of Minnesota and elsewhere, the defendant,

**TEQUISHA SOLOMON**,

for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, knowingly transmitted and caused to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, and sounds, as described below:

| Count | Date of Wire (on or about) | Wire |
|---|---|---|
| 1 | June 24, 2020 | Electronic submission from Minnesota of an application for an EIDL loan for defendant SOLOMON, which was routed through servers located outside of Minnesota. |
| 2 | July 16, 2020 | Electronic submission from Minnesota by defendant SOLOMON of a claim for UI benefits to California's EDD for Individual A, an incarcerated inmate at a Minnesota prison facility, which was routed through servers located outside of Minnesota. |
| 3 | August 17, 2020 | Electronic submission from Minnesota in the form of a telephone call to Bank of America regarding defendant SOLOMON's fraudulent claim for UI benefits from California's EDD. |
| 4 | October 19, 2020 | Electronic submission from Minnesota of a claim for UI benefits to the Illinois Department of Employment Security for defendant SOLOMON, which was routed through servers located outside of Minnesota. |
| 5 | March 24, 2021 | Electronic submission from Minnesota concerning a lender's note issued in response to defendant SOLOMON's fraudulent application for a PPP loan, which was routed through servers located outside of Minnesota. |
| 6 | August 31, 2021 | Electronic submission from Nevada to Minnesota's DEED of defendant SOLOMON's weekly certification of entitlement to UI benefits, which was routed through servers located outside of Minnesota. |

All in violation of Title 18, United States Code, Section 1343.

## FORFEITURE ALLEGATIONS

25. Counts 1 through 6 of this Indictment are incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), in conjunction with Title 28, United States Code, Section 2461(c).

26. Upon conviction of any of the offenses alleged in Counts 1 through 6, as set forth in this Indictment, defendant shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to the violation, as provided in Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), including but not limited to:

   a. a 2016 Jaguar Sedan, bearing VIN: SAJBD4BV5GCY21649 and temporary Nevada license plate number NX-672-282; and

   b. $25,000 in funds seized from Comerica Bank account x9341 in the name of "Auto Mall Automotive DBA Tobin Dodge Ram."

27. If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL

UNITED STATES ATTORNEY          FOREPERSON